**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PATRICIA MONTANA, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:23-cv-00775 |
| MIGUEL CARDONA, *et al.*, | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

By seeking a writ of mandamus, Plaintiffs ask the Court to interfere in the Department of Education's (the "Department") ongoing enforcement proceedings against a third party. A writ of mandamus is an extraordinary remedy that can be granted only under extreme circumstances not present here. *See Kerr v. U.S. Dist. Ct.*, 426 U.S. 394, 402 (1976).

Specifically, Plaintiffs seek a writ requiring the Department to complete its administrative adjudication of the Cedar Grove School District on a truncated timeline. The Department is already in the process of investigating whether the school district violated the Protection of Pupil Rights Amendment, 20 U.S.C. § 1232h ("PPRA"). That investigation was initially prompted by Plaintiffs' complaints about surveys the school district administered in 2021. Although the school district has already been ordered to destroy those surveys as a result of parallel state administrative proceedings pursuant to a New Jersey statute, the Department is continuing to investigate the school district's PPRA compliance more broadly.

1

The PPRA makes clear that the Department maintains broad discretion to decide when and how to enforce its provisions. *See id.* § 1232h(e) ("The Secretary shall take such action as the Secretary determines appropriate to enforce [the PPRA]."). The authority Congress delegated to the Department necessarily includes the ability to determine the scope and timeline for its PPRA enforcement proceedings. There is no basis for the Court to override the Department's judgment and usurp its discretionary process here.

Plaintiffs have not satisfied the threshold jurisdictional requirements that are necessary to establish any entitlement to mandamus. First, Plaintiffs lack standing to seek mandamus because they have failed to establish any legally-cognizable injury that is traceable to Defendants' ongoing enforcement proceedings. The school district has already been ordered to destroy the surveys that gave rise to Plaintiffs' concerns, and Plaintiffs do not assert any other concrete injury in fact. Moreover, it is black-letter law that a plaintiff cannot claim standing based on a broad interest in seeing their rights vindicated through enforcement proceedings against a third party. *See United States v. Texas,* 143 S. Ct. 1964, 1968 (2023) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

Second, Plaintiffs' claims fail as a matter of law because they cannot show that Defendants violated any clear duty to act. A Court may issue a writ of mandamus only if the agency's duty to act is "incontrovertible and not a matter within the agency's discretion." *In re Nat'l Nurses United*, 47 F. 4th 746, 752 (D.C. Cir. 2022). There is no mandated timeline for resolution of PPRA investigations, and Congress expressly delegated discretion over that process to the Department. Because Defendants do not have a clear duty to complete their ongoing investigation into the Cedar Grove School District within a particular time period, the duration of those proceedings is not reviewable.

Finally, even if the Court had jurisdiction to consider the duration of Defendants' administrative proceedings under the PPRA, the timeline here is reasonable and certainly not "so egregious as to warrant mandamus." *Id.* (quoting *Telecomm. Res. & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*")).

Accordingly, this case should be dismissed.[1]

## ARGUMENT

To establish entitlement to mandamus, a Plaintiff must demonstrate that (1) they have a clear and indisputable right to relief, (2) the government agency or official is violating a clear duty to act, and (3) no adequate alternative remedy exists. *United States v. Monzel*, 641 F.3d 528, 534 (D.C. Cir. 2011). These three threshold requirements are jurisdictional. *See In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005). Even when the threshold requirements are met, "a court may grant relief only when it finds compelling equitable grounds." *Id.* In cases alleging agency delay, the Court may "not issue the writ unless the agency's delay in fulfilling its duty is 'is so egregious as to warrant mandamus.'" *In re Nat'l Nurses United*, 47 F.4th at 753.[2]

---

[1] In response to Defendants' Motion to Dismiss, Plaintiffs filed a combined opposition and cross-motion for summary judgment. Defendants maintain that Plaintiffs' claims should be dismissed under Rules 12(b)(1) and 12(b)(6) because they fail as a matter of law. But Defendants also agree that there are no disputed issues of material fact at stake. Thus, to the extent the Court thinks summary judgment is a more appropriate mechanism for resolution here, Defendants respectfully request that the Court convert their motion to dismiss into a motion for summary judgment and enter judgment for Defendants. *See* Fed. R. Civ. P. 56(f)(1).

[2] As detailed in Defendants' opening brief, the standard for an undue delay claim under the APA is identical to the standard under the Mandamus Act. *See* Defs.' Mem. in Supp. of Mot. to Dismiss (Defs.' Mem.), ECF No. 16-1 at 27. Accordingly, for purposes of this inquiry those claims merge, and Plaintiffs' APA claims should be dismissed for all the same reasons set forth below. *Id.* at 27-28.

Plaintiffs bear the heavy burden of demonstrating that the right to mandamus is "clear and indisputable," *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005), and they have not met that high standard here.

## I.      This Court Lacks Jurisdiction Because Plaintiffs Do Not Have Standing

As detailed in Defendants' opening brief, Plaintiffs lack standing because they have failed to establish any legally-cognizable injury that is traceable to Defendants and redressable by this Court. Defs.' Mem. at 13-19. Plaintiffs have not set forth any facts to suggest they suffer ongoing harm as a result of the events that gave rise to their PPRA complaints, much less a harm that is traceable to Defendants' administrative process. *Id.* at 14. Rather, the school district has already been ordered to destroy the surveys that gave rise to Plaintiffs' PPRA complaints in 2021,[3] and Plaintiffs do not allege that they have been affected by any other PPRA violations since that time.

Notwithstanding the absence of any concrete injury in fact, Plaintiffs contend they have standing based on "a procedural right 'to have their PPRA complaints [against the third-party school district] investigated, processed, reviewed, and adjudicated" on a faster timeline. Pls.' Combined Mem. in Supp. of Mot. for Summ. J. and Opp'n to Mot. to Dismiss (Pls.' Mem.), ECF No. 20 at 15. But, even assuming *arguendo* that Plaintiffs have such "a procedural right"—which they do not—it would not obviate the requirement that they establish an injury in fact. *See Avagyan v. Blinken*, No. 22-2440, 2022 WL 19762411,

---

[3] Unable to dispute that New Jersey already ordered destruction of the surveys at issue, Plaintiffs suggest that the state's order "does not mean that the surveys or their results have been destroyed." Pls.' Mem. at 21. But Plaintiffs present neither evidence to suggest that the school district violated a direct order from its state government, nor any basis to support that bold inference. At the summary judgment stage, a plaintiff cannot "rest on 'mere allegations' [to establish standing], but must 'set forth' by affidavit or other evidence 'specific facts.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

at *3 (D.D.C. Sept. 29, 2022) ("[E]ven assuming the delay or denial of [agency action] is properly characterized as a procedural injury, 'the requirement of injury in fact is a hard floor of Article III jurisdiction,' and a procedural injury claim 'must be tethered to some concrete interest adversely affected by the procedural deprivation.'") (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) (quoting *Summers v. Earth Island, Inst.*, 555 U.S. 488, 497 (2009))). Plaintiffs have failed to establish any ongoing injury in fact, and that is dispositive.

But Plaintiffs also lack standing for two additional reasons: (1) their lawsuit contravenes the well-settled principle that individuals cannot seek administrative enforcement against third parties; and (2) no "procedural injury" can occur when there was no right to the demanded procedure in the first place, *i.e.,* no right to have PPRA complaints adjudicated on a particular timeline.

A.  Plaintiffs Lack Standing Because They Failed to Establish Any Injury in Fact

Where "plaintiffs sue based on a 'procedural injury'—or the agency's failure to act according to an applicable statutory or regulatory framework—that claim 'must be tethered to some concrete interest adversely affected by the procedural deprivation: '[A] procedural right *in vacuo* ... is insufficient to create Article III standing.'" *Aminjavaheri v. Biden*, No. 1:21-cv-2246-RCL, 2021 WL 4399690, at *6 (D.D.C. Sept. 27, 2021) (quoting *WildEarth Guardians*, 738 F.3d at 305 (quoting *Summers v. Earth Island, Inst.*, 555 U.S. at 497). "[T]o establish an imminent injury premised on a procedural harm sufficient to sustain Article III standing, plaintiffs must 'show 'both (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account' resulting from the challenged agency action or inaction.'" *Gorgadze v. Blinken*, No. 21-2421, 2021

WL 4462659, at *5 (D.D.C. Sept. 29, 2021) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007))). When courts apply this standard, they "must bear in mind 'that the constitutional requirement of imminence as articulated by the Supreme Court necessarily compels a very strict understanding of what increases in risk and overall risk levels count as substantial.'" *Id.* (quoting *Filazapovich v. Dep't of State*, 560 F. Supp.3d 203, 225 (D.D.C. 2021) (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 513 F.3d 234, 237–38 (D.C. Cir. 2008))).

Plaintiffs have not met their burden to establish the requisite injury in fact here. *See Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].")). Plaintiffs fail to allege any ongoing injury resulting from a PPRA violation, much less an injury that could be resolved by the Department's PPRA adjudication. Nor do they identify any other concrete harm that is substantially likely to occur as a result of the pending administrative process. *See* Pls.' Mem. at 15-18 (purporting to "explain why Plaintiffs have shown an injury and causation" without actually identifying any concrete harm that is occurring or that will occur).

Unable to identify any concrete injury in fact, Plaintiffs argue instead that the mere existence of the PPRA itself automatically "establishes that [they are] asserting a particularized injury to themselves, as they are the parents of minor schoolchildren and accordingly have special PPRA rights." Pls.' Mem. at 16; *see also id.* at 17 (arguing that "the statute's connection between the Department's investigation and the parent's cognizable interests [in their families' privacy] satisfies" the requirement to show "the agency action affects their concrete interest in a personal way."). Plaintiffs cite no support

6

for their bold proposition that the mere existence of a statutory right, in and of itself, is sufficient to establish injury in fact—and indeed there is none. On the contrary, the Supreme Court has made clear that "it would exceed Article III's limitations if, at the behest of Congress and in the absence of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws. The party bringing the suit must show that the action injures him in a concrete and personal way." *Summers*, 555 U.S. at 497; *see also id.* ("It makes no difference that the procedural right has been accorded by Congress . . . [T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."). Because Plaintiffs have failed to establish any concrete and personal injury that is impacted by the Department's ongoing investigation, this case cannot stand. *See Ctr. for Bio. Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) ("[T]he Supreme Court 'has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest.").

In the absence of any injury in fact to make out a case or controversy, there is nothing to be redressed by this lawsuit. It is thus unsurprising that Plaintiffs' redressability arguments are similarly flawed. For example, Plaintiffs suggest that their interests might be "redressed" through this case because they could benefit from "better PPRA compliance" that might result from the Department's investigation into the school district, or because the Department's ultimate determination might deter the school district from committing future violations. *See* Pls.' Mem. at 21-22. But the prospect of some abstract and speculative future benefit, including in the form of deterrence, does not fix the

fundamental problem that Plaintiffs have failed to establish an actual injury in the first place. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 186 (2000) (finding administrative action could provide redress in the form of deterrence for a plaintiff "who [is] injured or threatened with injury *as a consequence of ongoing unlawful conduct.*") (emphasis added).

Finally, to the extent Plaintiffs also imply they have standing based on an increased risk that the school district might violate the PPRA in some new way while the Department's investigation is pending, those concerns are far too speculative to form the basis for standing. *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 (2013) (standing cannot be based on a "speculative chain of possibilities"). That is especially true here, given that Plaintiffs have not identified a single harm resulting from a PPRA violation since 2021. Having experienced two years without issue already, any concern about imminent injury from future violations is demonstrably unlikely. *See Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (explaining that standing "focuses on whether appellants have shown a particularized [] interest of theirs that will suffer demonstrably increased risk" and whether the actions of a defendant are "likely to cause that demonstrable increase in risk").[4]

---

[4] Even if Plaintiffs could establish a relevant injury in fact based on actions of the school district, they still could not seek relief against the Department to address that injury if there is another adequate remedy available to them in court. 5 U.S.C. § 704 (limiting relief under the APA to circumstances in which "there is no other adequate remedy in court"). Courts have repeatedly held that a case against a federal agency seeking to advance administrative adjudication is barred under both the Mandamus Act and the APA where the plaintiff can bring suit directly against a regulated entity. *See, e.g., Women's Equity Action League (WEAL) v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990) (dismissing APA and Mandamus claims contending that agency did not "process [Title VI and Title IX] complaints, conduct investigations, issue letters of findings, or conduct compliance reviews as promptly or expeditiously as plaintiffs would like" because plaintiffs could bring suit against funded entities accused of noncompliance); *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532-33 (D.C. Cir. 1983) (dismissing Mandamus Act and

B.  <u>Plaintiffs Do Not Have Standing to Seek Administrative Enforcement Against a Third Party</u>

To the extent Plaintiffs claim they have standing based on a broad interest in seeing their PPRA rights "vindicated" through enforcement against the school district, Pls.' Mem. at 17, 25-26, that argument is foreclosed by well-settled precedent. The law is clear that individuals cannot establish standing based on the potential for an indirect benefit flowing from enforcement proceedings against a third party.[5]

As detailed in Defendants' opening brief, Defs.' Mem. at 17-19, the Supreme Court has "consistently h[e]ld that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). The Supreme Court reaffirmed this principle just last month. *See Texas*, 143 S. Ct. at 1968 (2023) (reiterating

---

APA claims that agency had failed to respond adequately to administrative complaints because suits directly against discriminating entities were adequate). As explained in Defendants' opening brief, the PPRA has not been held to be enforceable through a private cause of action. Defs.' Mem. at 15 n.7. But Plaintiffs' brief lays out their view as to why they believe a private cause of action is nonetheless available against the school district to enforce their PPRA rights. If Plaintiffs' argument were deemed correct by the Court, then their case should be dismissed for the additional reason that they have another adequate remedy in court.

[5] As explained in Defendants' opening brief, the purpose of the Department's enforcement proceedings is to ensure compliance with the PPRA—not to vindicate Plaintiffs' rights or make them whole. *See* Defs.' Mem. at 15. Because the PPRA is Spending Clause legislation, it only mandates certain conditions that educational institutions and agencies must meet as a condition on their receipt of federal funds. *Id.* Thus, if the Department ultimately were to find that the school district committed a PPRA violation, its only recourse is to impose orders on the school district or terminate its funds—the Department could not order any direct relief for Plaintiffs. *Id.*

the "long held" principle that "a party 'lacks a judicially cognizable interest in the prosecution . . . of another'") (quoting *Linda R.S.*, 410 U.S at 619).[6]

The same principle applies to agency enforcement proceedings. *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the executive branch."). Decisions about "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" falls "within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021); *Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997) ("[S]eeing that the laws are enforced . . . [is] not legally cognizable within the framework of Article III"). Accordingly, Plaintiffs do not have a legally-cognizable interest in seeing the school district sanctioned by the Department for violating the PPRA, nor do they have standing to dictate how the Department adjudicates those proceedings.

Notwithstanding this well-settled precedent, Plaintiffs claim they still have a legally-cognizable interest in dictating the terms of the Department's enforcement

---

[6] Plaintiffs attempt to distinguish *United States v. Texas* by quoting its language out of context. Pls.' Mem. at 25 n.6. The *Texas* Court noted that a different standing analysis might apply in situations where a challenged Executive Branch policy involves both its "arrest or prosecution policies *and* the Executive Branch's provision of legal benefits or legal status" such as work authorization or Medicare eligibility. 143 S. Ct. at 1974. The point being made by the Court was that the additional involvement of those concrete entitlements might lead to a different conclusion on standing because it would "implicate more than simply the Executive's traditional enforcement discretion," Pls.' Mem. at 25 n.6 (quoting *Texas*, 143 S. Ct. at 1974), as opposed to merely asserting the type of abstract interest in the outcome of a third-party adjudication that plaintiffs invoke here.

proceedings against the school district, on the theory that other courts have found standing to challenge agency actions based on "a potential indirect benefit." Pls.' Mem. at 23. But the "procedural injury" cases to which Plaintiffs cite do not stand for this proposition, and also did not involve enforcement proceedings. *Id.* at 23-24 (citing *WildEarth Guardians*, 738 F.3d at 306, and *Ctr. for Bio. Div.*, 861 F.3d at 185.). Rather, those cases involved environmental groups seeking to prevent administrative decisions that would affirmatively permit implementation of environmental disruptions, which would then cause harm to the plaintiffs. *See WildEarth Guardians*, 738 F.3d at 306 (seeking to prevent the *authorization* of a lease that would cause pollution); *Ctr. for Bio. Div.*, 861 F.3d at 185 (seeking to prevent *registration* of harmful pesticide). In other words, the plaintiffs in those cases showed that they were in danger of sustaining a direct injury as a result of the administrative proceedings at hand. In contrast, Plaintiffs here allege only a past injury—a one-time distribution of surveys that violated the PPRA—which occurred independently from the Department's subsequent administrative proceedings. *Compare Linda R.S.*, 410 U.S. at 618 (no standing where plaintiff had not shown her failure to secure child support payments resulted from the challenged nonenforcement against the putative father). Moreover, unlike the credible threats of imminent harm at issue in *WildEarth Guardians* and *Center for Biological Diversity*, Plaintiffs' claim that enforcement against the school district might prevent future harm is speculative at best, and thus inadequate to establish standing. *See supra* Part I.A (addressing the speculative nature and improbability of Plaintiffs' claims regarding future injury); *see also Linda R.S.*, 410 U.S. at 618 (prospect that prosecuting default on past child support payments would result in future support payments was too speculative to establish standing to challenge non-prosecution).

Plaintiffs' reliance on *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) and *FEC v. Adkins*, 524 U.S. 11 (1998), for their "indirect benefit" theory of standing also is misplaced. Pls.' Mem. at 24. The *Laidlaw* Plaintiffs brought their case seeking civil penalties to enforce the Clean Water Act pursuant to an express statutory provision stating that an enforcement suit may be brought by any "citizen." 528 U.S. at 174-75. By contrast, the PPRA contains no such "citizen-suit" provision. Similarly, *Adkins* involved a provision of the Federal Election Campaign Act providing that "[a]ny person" who believes FECA has been violated may file a complaint with the FEC, and that "[a]ny party aggrieved" by an FEC order dismissing such a party's complaint may seek district court review of the dismissal. 524 U.S. at 19. Again, the PPRA contains no comparable provision. Accordingly, *Laidlaw* and *Adkins* do not stand for the sweeping proposition that any person has standing to demand enforcement of a federal statute against a third party based on the chance that they will indirectly benefit. On the contrary, the statutory schemes in those cases demonstrate that when Congress wants to authorize citizens to enforce statutory obligations against third parties, it knows how to do so. The fact that Congress chose not to include any such provision in the PPRA only confirms that individual plaintiffs cannot usurp the Department's enforcement role with respect to violations of that statute.

Finally, Plaintiffs argue that "all the government's talk about discretionary 'refusal[s] to institute proceedings' is irrelevant" because "the PPRA imposes a mandatory duty on the Department to act in response to the Plaintiffs' complaints." Pls.' Mem. at 24-25. As discussed *infra* in Part I.C, the PPRA does not impose a mandatory duty on the Department to act on Plaintiffs' complaints. But, even if the statute did so, that still would

12

not provide Plaintiffs with standing to challenge enforcement proceedings against a third

party. In *United States v. Texas*, the statute at issue provided that the United States "'shall'

arrest certain noncitizens." 143 S. Ct. at 1973. Still, the Court held that "[g]iven the 'deep-

rooted nature of law-enforcement discretion,' a purported statutory arrest mandate, without

more, does not entitle any particular plaintiff to enforce that mandate in federal court." *Id.*

(quoting *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 761, 764–765, 767, n.13

(2005)). The *Texas* Court further explained that "[f]or an arrest mandate to be enforceable

in federal court, we would need at least a 'stronger indication' from Congress that judicial

review of enforcement discretion is appropriate," such as "specific authorization for

particular plaintiffs to sue." *Id.* As discussed above, the PPRA contains no such specific

authorization or any other language indicating Plaintiffs have a right to sue. Quite the

opposite, the PPRA contains a broad grant of discretion to Defendants, stating that "[t]he

Secretary shall take such action as the Secretary determines appropriate to enforce this

section," 20 U.S.C. § 1232h(e), and "shall establish or designate an office and review board

within the Department" to enforce the statute in a manner consistent with that discretionary

enforcement authority, *id.* § 1232h(f). Under these circumstances, Plaintiffs lack standing

to seek enforcement against a third party pursuant to the PPRA.

C.  Plaintiffs Lack Standing Because They Have Not Suffered a "Procedural
Injury"

Plaintiffs also lack standing based on a "procedural injury" theory because they

have not suffered any violation of a procedural right. Contrary to Plaintiffs' assertions, the

PPRA does not require the Department to investigate and/or adjudicate every complaint,

much less on a particular timeline. Pls.' Mem. at 15. While Plaintiffs selectively quote from

Section 1232h(f) of the PPRA to make their point, that section contains no such mandate.

Rather, it merely provides that: "The Secretary shall *establish or designate an office and review board within the Department of Education to* investigate, process, review, and adjudicate violations of the rights established under this section." 20 U.S.C. § 1232h(f) (emphasis added).[7] And Plaintiffs' argument is directly contravened by the PPRA's actual enforcement provision, which states that "[t]he Secretary shall take such action as the Secretary determines appropriate to enforce [the PPRA]." *Id*. § 1232h(e). In other words, Congress did not specify when or how the Department must address violations of the PPRA. Instead, Congress required only that the Department set up an office and review board to do so, and otherwise left the details of the administrative scheme up to the Department's discretion. Consistent with that discretion, the Department instituted an enforcement process that does not require completion of a PPRA investigation on a fixed timeline, and which accounts for the fact that different investigations may require different investigative tasks, different fact-gathering processes, and different levels of review and analysis to complete. *See infra* in Part II (discussing additional reasons why the Department does not have a duty to complete its proceedings on a fixed timeline).

Defendants' actions here have fully comported with the applicable statutory and regulatory scheme. The Department is in the process of investigating Plaintiffs' complaints in accordance with the steps laid out in its regulations. *See* Defs.' Mem. at 6-7. And because Defendants are already doing what the law requires, no procedural injury has occurred. The fact that Plaintiffs would prefer those proceedings to move faster—*i.e.*, on a timeline that is not mandated by any statute or regulation—does not somehow transform the

---

[7] Plaintiffs repeatedly omit the italicized language when quoting from this provision. *See, e.g.*, Pls.' Mem. at 15.

Department's lawful actions into a procedural injury that renders its discretionary process reviewable in court. *See generally Texas*, 143 S. Ct. at 1969 ("By ensuring that a plaintiff has standing to sue, federal courts 'prevent the judicial process from being used to usurp the powers of the political branches.'") (citing *Clapper*, 568 U.S. at 508).

## II.     This Case Should be Dismissed Because Defendants Have Not Violated A Clear Duty to Act

Even if Plaintiffs had standing, this case should be dismissed because Defendants have not violated any "crystal-clear legal duty to act." *In re Nat'l Nurses United*, 47 F.4th at 72. Writs of mandamus are "reserved only for the most transparent violations of a clear duty to act." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (citation omitted). The duty to act must be "incontrovertible and not a matter within the agency's discretion." To determine whether an agency has a clear duty to act, the Court must look to the applicable statutory requirements, and "whether an Executive Branch agency retains discretion over a particular action." *In re Nat'l Nurses United*, 47 F.4th at 752. Plaintiffs' motion does not come close to overcoming this high threshold.

There is no statutory or regulatory provision that requires the Department to complete its investigation into PPRA complaints on a fixed timeline—and Plaintiffs do not dispute this point. Instead, Plaintiffs argue that the PPRA's overall statutory context "requires" the Department to complete its adjudicatory process with respect to the Cedar Grove School District more quickly. Pls.' Mem. 8-11. On the contrary, the PPRA's statutory scheme does not require the Department to make any determination at all, *see supra* Part I.C, much less on the timeline that Plaintiffs consider "reasonable."

The PPRA's statutory scheme expressly grants the Department broad discretion to decide when and how to enforce the PPRA. The statute's enforcement provision states:

"The Secretary shall take such action *as the Secretary determines appropriate* to enforce this section." 20 U.S.C. § 1232h(e) (emphasis added).[8] The PPRA further provides that "[t]he Secretary shall establish or designate an office and review board within the Department of Education to investigate, process, review, and adjudicate violations of the rights established under [the PPRA]." *Id.* § 1232h(f). In other words, Congress explicitly authorized the Department to devise the system for investigating, processing, and adjudicating PPRA violations, as well as the discretion to decide when and how enforcement is appropriate.  Plaintiffs fail to grapple with this statutory scheme and the broad discretion it affords the Department. Indeed, Plaintiffs' brief does not even cite, much less explain, Section 1232h(e), even though that section is entitled "Enforcement" and it is the very PPRA provision that sets forth the scope of the Department's broad enforcement authority.[9]

---

[8] The only limit Congress imposed on this broad agency discretion is designed to *constrain* the Department's ability to enforce in certain circumstances, not to *require* enforcement in any such case. *See id.* § 1232h(e) (creating an exception from agency's enforcement discretion only to prohibit terminating funds: (1) absent a failure to comply with the PPRA; and (2) unless compliance with the PPRA "cannot be secured by voluntary means").

[9] Rather than discuss the statute's actual enforcement provision, Plaintiffs focus on other aspects of the PPRA that have nothing to do with this case. Pls.' Mem. at 9. Those provisions address certain annual notice requirements, 20 U.S.C. §§ 1232h(c)(2)(A), 1232h(d) and 1232h(c)(5)(C), and the requirement that funding recipients have a policy to address parents' information requests, 20 U.S.C. §1232h(c)(1)(F). None of these provisions speak to the scope of the Department's enforcement authority. And the Complaint in this case does not allege that any violation of these provisions has occurred. *See* Am. Compl., ECF 15. Nor were any of these provisions even invoked in Plaintiffs' PPRA complaints that underly this lawsuit. Rather, all of Plaintiffs' administrative complaints addressed just the narrow issue of the Cedar Grove School District's administration or distribution of the 2021 surveys and the school district's failure to give them the opportunity to opt their children out of those surveys. *See* Am. Compl., Exs. 13-18 (Plaintiffs' PPRA complaints).

As detailed in Plaintiffs' opening brief, courts have held that the lack of a Congressionally-mandated timeline, together with an explicit grant of discretion to devise an adjudicatory process, necessarily render the pace of an agency adjudication non-reviewable. *See* Defs.' Mem. at 21. This is because "[i]n the absence of statutorily prescribed time limitations or statutory factors to guide [regulations that set the adjudication process], it is difficult to see how the pace of [adjudication] could be anything other than discretionary." *Orlov v. Howard*, 523 F. Supp. 2d 30, 35 (D.D.C. 2007). When Congress grants an agency discretion to create and implement an investigation and enforcement process, that necessarily encompasses the pace of adjudication. "Otherwise, the grant of discretion would be illusory, given that courts could drastically alter the regulations prescribed by dictating what pace of adjudication the regulations must permit." *Beshir v. Wolf*, 10 F. Supp. 3d 165, 174 (D.D.C. 2014); *see also Butanda v. Wolf*, 516 F. Supp. 3d 1243, 1248 (D. Colo. 2021) ("The lack of a Congressionally mandated timeline and the concomitant grant of discretion to determine the 'time' and 'conditions' of admitting U-Visa applicants renders the pace of adjudication non-reviewable."). Consistent with the statutes at issue in these cases, the PPRA (1) contains no timeline for investigating PPRA violations; and (2) grants the Department broad discretion to promulgate regulations that create from scratch the process for adjudicating PPRA violations. It follows that the pace of those adjudications falls squarely within the Department's discretion, and is thus non-reviewable.

The process set forth in the Department's regulations further confirms that there is no fixed timeline for adjudication of PPRA investigations. While Plaintiffs note that there is a deadline for filing PPRA complaints, Pls.' Mem. at 9-10, they fail to discuss the multi-

step process that follows—which is a scheme designed to ensure the Department has complete information before reaching any conclusions and/or taking enforcement steps. *See* 34 C.F.R. §§ 98.5-98.10. As detailed in Plaintiffs' opening brief, this process includes opportunities for a funding recipient to submit a response, the potential for the Department to solicit reports, and that the complainant and the funding recipient may be permitted to submit further written oral arguments and information. Defs.' Mem. at 22. Given the variability of the options the Department may employ to conduct its investigation, which may take more or less time depending on the particular circumstances at hand, the scope and timing for each case necessarily varies on a case-by-case basis.[10]

Because Defendants do not have a clear duty to complete their ongoing investigation into the Cedar Grove School District within a particular time period, Plaintiffs' claims fail as a matter of law.

### III.   Even if the Pace of Defendants' Administrative Proceedings Were Reviewable, the Timing is not "So Egregious as to Warrant Mandamus"

As discussed above, the absence of any statutory deadline, coupled with Congress's express grant of broad discretion to the Department, disposes of any claim that the agency

---

[10] Given the variable nature of PPRA proceedings, Plaintiffs' attempt to draw parallels with *C.N. v. Ridgewood Bd. Of Educ.*, 430 F.3d 159 (3d Cir. 2005), is misplaced. *See* Pls.' Mem. at 10. Plaintiffs make much of the fact that the PPRA complaints discussed in that case were resolved within six weeks. Even putting aside the fact that *C.N.* is a case from nearly twenty years ago when the composition of the PPRA compliance office was not the same, *see* Defs.' Mem. at 5, the particular circumstances in that case were obviously quite different. Among other things, the PPRA complaints in *Ridgewood Board of Education* were being investigated by the Department at the same time that civil litigation also was pending. Thus, as the Court explained, the Department was able to use evidence, including declarations and affidavits that "had been borrowed from th[e] civil action in its pre-discovery stage." 430 F.3d at 172 n.16. Here, there is no parallel civil action that provides an opportunity for the Department to "borrow" such evidence.

is violating a clear duty to complete its PPRA investigation more quickly. Thus, the Court need go no further. But, even assuming *arguendo* that the Court had jurisdiction to consider the question, Defendants' timing is not "so egregious as to warrant mandamus." *TRAC*, 750 F.2d at 79; *see also In re Nat'l Nurses United*, 47 F. 4th at 753 (explaining that the court cannot "issue the writ unless the agency's delay in fulfilling its duty is so egregious as to warrant mandamus").[11]

Where applicable, the D.C. Circuit has identified six principles to determine whether mandamus is an appropriate remedy for agency delay in fulfilling its duty:

> (1) the time agencies take to make decisions must be governed by a "rule of reason," (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason,  (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake, (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, (5) the court should also take into account the nature and extent of the interests prejudiced by delay, and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC*, 750 F.2d at 80 (citations omitted). The *TRAC* factors "function not as a hard and fast set of required elements, but rather as useful guidance as to whether a delay is 'so egregious as to warrant mandamus." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189-90 (D.C. Cir. 2016) (quoting *TRAC*, 750 F.2d at 79). As detailed in Defendants' opening brief,

---

[11] Plaintiffs' brief merges their analysis of whether Defendants have "a clear duty to act" with the separate question of whether Defendants' timing is "unreasonable," based on the mistaken impression that these are the same question. Pls.' Mem. at 7 n.1. While the unreasonable delay analysis under the *TRAC* factors "*may* go to the threshold jurisdictional question [of whether] the agency's delay violate[s] a clear duty," *Burwell*, 812 F.3d at 190 (emphasis added), that is not always the case. Where, as here, Defendants' timing cannot be reviewed for reasonableness because the entire process is left to the agency's discretion, that threshold matter is dispositive and the *TRAC* analysis has no place. *See supra* Part II.

Defs.' Mem. at 24-27, any consideration of the *TRAC* factors only confirms that mandamus is not warranted here.

### 1.  *Defendants' Timing is Consistent with the "Rule of Reason"*

In the absence of a statutory deadline, the first two *TRAC* factors assess whether there is "sufficient 'rhyme [and] reason" in explaining the length of time in which the matter in question has been before the agency. *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 165-66 (D.D.C. 2021). That standard is readily met here.

As discussed *supra* in Part II, the PPRA does not impose any timeline for adjudication, and the Department's regulatory process is designed to allow the agency time it needs in order to fully understand the relevant facts and reach a determination consistent with the statute and regulations. The Department's investigation into the Cedar Grove School District is moving forward in a manner that is consistent with these parameters. Plaintiffs were informed in October 2022 that the Department's investigation is underway. Compl. ¶¶ 5, 14. And the Department informed Plaintiffs less than a year ago that it is working to collect necessary information from the school district in order to fully assess the concerns raised, Compl., Ex. 10, which is what is contemplated by the applicable regulations. *See* 34 C.F.R. ¶¶ 98.8(b)(2), 98.9(a). Contrary to Plaintiffs' unfounded assertions that the Department is doing "nothing," Pls.' Mem. at 11, Defendants' process of gathering information is ongoing, and thus a writ of mandamus would force the Department to issue a decision without complete information and without full participation by the school district. That outcome would contravene the multi-step process contemplated by the applicable regulations, as well as the PPRA's statutory mandate requiring the Department to work with funding recipients in an effort to achieve voluntary compliance.

*See* 20 U.S.C. § 1232h(e)(2) (action to terminate funding only allowed if compliance with the PPRA "cannot be secured by voluntary means").

Finally, Plaintiffs' contention that the issues before the Department should be deemed "not complicated" because "New Jersey dealt with them in a few months," Pls.' Mem. at 10-11, misapprehends the statutory and regulatory scheme associated with the PPRA. Although the New Jersey statute has some provisions that are similar to the PPRA, the statutes are not interchangeable. Enforcement of the PPRA involves its own factfinding process as set forth in the implementing regulations, and also allows the Department to consider broader issues that go beyond the four corners of Plaintiffs' underlying complaints. *See* Defs.' Mem. at 9. While the New Jersey Commission only addressed the narrow issue of whether the Cedar Grove School District's 2021 surveys violated New Jersey law, *See* Am. Compl, Exs. 4 & 5, the Department's investigation may address the school district's broader compliance with other PPRA requirements (such as what policies the school district has adopted pursuant to various requirements of the PPRA, and the parameters of the school district's parental notifications). *See* Defs.' Mem. at 9; *see also* Pls.' Am. Compl., Ex. 10 at 5-6 (letter to the school district demanding it provide information relating to these broader issues). It is neither unreasonable nor surprising that the Department's broader effort is taking more time.

> ### 2. *Allowing the Department to Complete the Adjudicatory Process on its Regular Timeline will not Injure or Prejudice Plaintiffs*

*TRAC* Factors three and five consider the effects of agency delay on Plaintiffs and the public. *See In re Ctr. for Bio. Div.*, 53 F.4th 665, 671 (D.C. Cir. 2022). As discussed *supra* in Part I, Plaintiffs do not allege any ongoing harm as a result of the Department's ongoing investigation. The New Jersey Commission already ordered the school district to

destroy the allegedly offending surveys, and Plaintiffs have offered no evidence to suggest that the school district has disobeyed that clear order from its state government. Plaintiffs do not allege that the Cedar Grove School District has engaged in any other unlawful activity under the PPRA, much less activity that is causing harm while the Department works through its administrative process. Thus, Plaintiffs' suggestion that the "[d]elay threatens the rights of families," Pls.' Mem. at 11, is completely unsupported.

While the PPRA is obviously concerned with the "protection of pupil rights" and sets requirements for funding recipients to follow in order to address those concerns, there is no evidence anywhere in the record to suggest those interests would be better served by rushing the Department's investigation to conclusion. On the contrary, by taking the time to engage in a more complete investigative process that considers broader PPRA compliance issues than just what was set forth in Plaintiffs' complaints, the Department is working to better protect the very rights that Plaintiffs purport to invoke.

3. *Requiring the Department to Expedite Its Investigation Would Unduly Burden the Agency*

*TRAC* factor four considers "the effect of expediting delayed agency action on activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. As explained in Defendants' opening brief, forcing the Department to expedite its investigation would unduly tax the resources available to the agency. Defs.' Mem. at 25. The Department's Student Privacy Policy Office (SPPO), which is the office that handles PPRA complaints, also handles all of the Department's work to protect privacy across the entire United States education system. This includes investigating and enforcing student rights under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (FERPA), developing policy and guidance on student privacy policy issues, managing privacy risks across the

Department to safeguard personally-identifiable information, and providing technical assistance to help schools and school districts safeguard various information about students. *Id.* Thus, the issue is not whether there is a "significant PPRA queue" as Plaintiffs suggest, Pls.' Mem. at 13, but rather the fact that the Department (and specifically the SPPO) is in the "unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Labs, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991).[12] In other words, given its competing priorities and subject matter expertise, the Department is in the best position to determine what resources are available for its PPRA investigation into the Cedar Grove School District, and to determine what is necessary to complete that investigation accordingly. There is no basis for the Court to override the Department's judgment as to its allocation of resources here.[13]

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in Defendants' Motion to Dismiss and accompany memorandum, this case should be dismissed, or alternatively

---

[12] Plaintiffs attempt to undermine this well-settled principle—that an agency is generally in the best position to weigh its own priorities—by quoting certain language from *In re Center for Biological Diversity* out of context. Pls.' Mem. at 14. The quoted sentence from that case actually reads in full: "However many priorities the agency may have, and however modest its personnel and budgetary resources may be, there is a limit to how long it may use these justifications to excuse inaction <u>in the face of a statutory deadline and Court order</u>." 53 F.4th at 672 (citation omitted) (emphasis added). Plaintiffs omitted the underlined language, which demonstrates that *Center for Biological Diversity* is clearly distinguishable from the instant matter, since this case involves neither a statutory deadline nor any court order.

[13] The sixth *TRAC* factor considers whether any "impropriety "lurk[s]" behind the alleged agency delay. As Defendants' have explained, no impropriety occurred here. *See* Defs.' Mem. at 27. Plaintiffs do not dispute this conclusion, but rather dismiss the Department's good faith as "beside the point." Pls.' Mem. at 14.

summary judgment should be granted for Defendants. Plaintiffs' Motion for Summary Judgment should be denied.

DATED: July 21, 2023

<div style="margin-left: 40%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

CARLOTTA WELLS
Assistant Branch Director

/s/ Emily Nestler

EMILY B. NESTLER (D.C. Bar # 973886)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Rm. 12512
Washington, DC 20530
Tel: (202) 305-0167
Email: emily.b.nestler@usdoj.gov

*Counsel for Defendants*

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of July, 2023, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record.

*/s/ Emily B. Nestler*
Emily B. Nestler